Good morning. I'm Carol Strickman, I'm representing Appellant Kenneth Singleton. And I raised two issues in my brief. If I intend to focus on the first one, unless the Court has another idea here, my argument is, of course, that my client's waiver of his right to counsel was coerced. And I'd like to make three points today, basically. First, that he did not reinitiate the conversation. Secondly, the officers coerced his waiver by negating the substance of the Miranda warning, that anything he said could be used against him in a court of law. And third, that the officers intentionally violated Miranda. So in terms of the reinitiation, the record shows that my client was given his Miranda warnings, he invoked his right to counsel, and at that point, the officer said, well, we can't talk to you, and he said, wait, I will talk to you or I want to talk to you. And the Respondent argues that this was a reinitiation. I don't think this was a reinitiation. I think he was saying, I want to talk to you with an attorney present. That was what they asked him. Do you want to have a right to have an attorney present with you while you are being questioned? He says, okay, I'll take that attorney. And they say, well, no, now we can't talk to you. He said, well, no, I want to talk to you.  Did he say that? No. He said, I'm going to talk to you. Well, okay. All we have is what – I think one could – there's evidence in the record that he did say that. And if – and what? He did say, get the attorney here so I can talk to you. Well, you know, what he said to his mother immediately afterwards was, at first, I didn't want to talk to him without no lawyer. And if you take away that double negative, he's saying, at first, I wanted to talk to them with a lawyer. So that's what he's telling his mother. And I think when he asks for – when he says, I'll talk to you, after they say, you have a right to an attorney, at worst, I think you could find that he was asking for an attorney present while he talked. Now, at worst, from my point of view, the statement was ambiguous. Well, if the statement is ambiguous, then the burden is on the officer to ask clarifying questions, not just start asking, you know, go into interrogation. And this officer testified he never once ever asked any clarifying questions. So we have a situation where it's ambiguous. Now, at best, for the – for the respondent, but even if he in good faith thought he was trying to reinitiate – and he – by the way, he was – the officer was asked at excerpts of record, page 57, did you interpret this as a meaningful reinitiation? And he just goes sideways and doesn't answer that question. But even if he thought it was, what followed eventually was an hour and 20 minutes of him not being willing to answer any questions. So I think that that later interview makes it very clear that he has not changed his mind and has waived his right to counsel, because he would have started talking then, and he didn't. So the officer should have realized that whatever his statement was, it was not a reinitiation. He never tried to clarify it. He just tried to ignore it and move on. And what he moved on to do was to coerce that waiver. The Miranda warning says anything you say can be used against you in a court of law. Basically, it's a warning. If you talk, you could hurt yourself. And Ken was told that once. If you talk, you could hurt yourself. That's essentially what. But then the officer spends an hour, more than an hour, trying to give Ken the opposite idea. You know, I don't need to hear from you. We have a lot of witnesses. We talked to your, you know, co-defendant, Ryan. You know, we know what he has to say. We know what happened. We, you know, we could hear your side of the story. You could tell us if you want, but, hey, we don't need to know. And the implication of that is if you talk to us, it's not going to be hurt. It's not going to hurt you in a court of law. It might help. It's not going to hurt. Now, if we agreed that the Miranda rights weren't waived, that I may be hearing your argument as saying that means the confession was coerced. And I think that's an extra step, isn't it? I think the waiver of rights was coerced. That's what was coerced. Kennedy, that gets you to a coerced confession, though. Which led to a confession which we say is coerced, yes. Well, see, I'm not – a confession that's issued in violation of Miranda is not necessarily coerced. No, but that's what I'm saying. The waiver of rights, the waiver of his right to counsel was coerced. He started out asserting the right in the end by – by he inferentially, implicitly waives it. He never explicitly waives it, but he implicitly waives it by talking. And in the middle, we have an hour and 20 minutes of pressure on him, which I find anybody to – I think it's – The argument really amounts to saying he didn't waive his Miranda rights. I'm sorry? The argument really amounts to saying he didn't waive his Miranda rights. He didn't waive them. And they were violated. Well, he talked without the presence of counsel, so I think that's seen as an implicit waiver. But he didn't explicitly waive them, and he didn't voluntarily waive them. He waived them after he was coerced to waive them by the officer's conduct. Okay. Where did the State court go wrong? This – do you mean the trial court or the court of appeal? Or the last reason State court decision. Okay. Well, that would be the State court of appeal. State court of appeal. Well, first of all, they made a lot of factual omissions. They ignored a lot of the facts. I think that's primarily where they went wrong. What fact? Well, specifically, I would say a number of facts. The officer testified it was his goal to get Ken to talk when he went into that third interview. That was his goal. To me, that's an important fact. That's his intent. We've got potentially an ambiguous statement. His goal is to get him to talk. He doesn't Mirandize him again. He doesn't get a waiver. He spends his effort on the job getting Ken to waive his right to counsel. And Ken's saying, I don't – I want to talk to you, but I don't want to talk to you right now. Well, why not? Because his lawyer's not there. There is no lawyer. And so he wants to talk to his mother about this. He's – he wants to talk, but not now. What is – you know, and does they try to figure out why? What is the problem? Does it have anything to do with an attorney? Oh, well, they don't ask those questions. They – so I think the court also, I believe, that the court got – is confused about the coercion idea. The issue is, is the waiver coerced? Did the officer attempt to get Ken to talk without an attorney present? That is the crux of the problem. All the cases and the analysis that – But what did he do? I mean, okay, you say he intended – he wanted him to talk. I suppose every police officer – Right. As soon as they read the rights, want him to talk. Sure. Well, you know, that's the thing. We have an hour and 20-minute conversation. Now, you know, I have 10 minutes to talk to you. This is, you know, a police officer talking for an hour and 20 minutes to my client, the purpose of which is to get him to waive his right to counsel. We know somewhat what he said. We know what he said based on – not from his – what he wrote later. What he wrote later just completely – it's blank. He doesn't say anything about what he did. But Ken says, he told me he had all these witnesses. He told me he had my co-defendant. You know, Ryan, he told him – he, you know, he told him his case – my case is very strong. That's what he was saying. He was harping on the strength of the case, for one. He was talking about you might have had a reason, maybe you had a reason, maybe you didn't mean to do this. He's trying to get him to think that it's to his advantage to talk or it's not going to hurt him to talk. That's what he was doing. And he spent an hour and 20 minutes doing that. That's a long time to be going after somebody. And this is what you're not – exactly not supposed to do, as I understand it. I don't – I haven't seen a case yet that says once someone invokes the right to counsel and – but doesn't, doesn't start talking on the subject, you can spend a bunch of time trying to really get them to waive counsel. That's not what you're supposed to do. You're supposed to be neutral. You're supposed to say, oh, do you want to talk to me or not? If you do, you know, then you'll have to waive your right to counsel. Are you willing to do that? Yes or no? Here's the form. Sign it and we'll start talking. Otherwise, send them to booking. If you won't, then you go to booking. Kagan. Kagan. And what about the hour and a half? What would he – when did that occur that you're talking about? That was, I think, the 620, 640 to 8 o'clock time period. That's the key time frame, is what was the officer doing then? And we have two people that tell us. Ken on his phone to his mother immediately afterwards, not knowing that he's being taped. And he says, at first, I didn't want to talk to him without no lawyer. But then he says, but then it seems that they have so much evidence, I'm looking for the exact quote, that it just doesn't matter anymore, is essentially what he says. And so essentially he's saying – Can I just get kind of a bottom line? Is it your view that once he invoked his right to counsel once, that all questioning should have ceased at that point? It should have ceased. Now, if the officer – And your best Supreme Court case that tells us that answer is what? That's Edwards. That's what Edwards says. Edwards – now, but then there's – the next step is, okay, what if he reinitiates? That becomes the exception. So analytically, that's the exception, yes. Well, what's a – you know, he didn't – they didn't send him to his jail cell. He thinks about it overnight and says, you know what, I'm willing to talk to you. We didn't have that kind of reinitiation. We have this one little statement, I want to talk to you. I believe ambiguous. He says that – Wait a minute. Here – look. I'm just trying to understand your position, because all of that happened in the early afternoon. Yes. And you're saying that the coercion happened later. Later. And that some – but we're supposed to find the coercion in the early afternoon. No. No. I think the coercion happens later. The coercion happens during that hour or 20 minutes when they're – Okay. Appellant replied, I want a lawyer. Holloman informed him the police could no longer talk to him once he requested a lawyer. He ended the interview, told him he had to leave. The two officers stood up and he said, hey, hold up, hold up, I am going to talk to you guys. Now, there's no coercion there. I'm – he says either I'm going to talk to you, I want to talk to you, that's right, I want to talk to you, that's right. There's no coercion there. So – but and if when they went in the next time, he said, okay, let me tell you what happened, this is what happened, then I wouldn't be standing here. But they go in the next time, he won't talk to them. He's not talking to them. They pull out every trick in the book. For an hour and 20 minutes, he's still not talking to them. From that behavior, during that hour and 20 minutes when he's explicitly reluctant to talk and refusing to talk, refusing to talk about the substance of the case, and asking for his mother multiple times, at that point, I think it becomes crystal clear that he has not waived. All right. You haven't used your time. I think I – Okay. Thank you. I think I see what she's saying. May it please the Court, Peggy Ruffray for a respondent appellee. First of all, unlike the preceding five cases that the Court has heard, this is an ADPA case, so it's governed by the deferential standard review, which is a substantial change from the direct review cases. And the question that's presented here is whether the confession was coerced such that it couldn't be used for impeachment, which is a totality of circumstances test. Now, that is a very broad and general test, and the Supreme Court has said the more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. So that is the – those are the broad parameters that this has – court has in looking at whether this State court's opinion was unreasonable. Now, on the first point of the reinitiation, I think it's clear that when the officers say, okay, you've asked for a lawyer, we can't talk to you anymore, they physically stand up to leave, and he says, hold up, I want to talk to you. Well, it's clearly reasonable to believe that at that point he's changing his mind. And I think that's a very However, I'm not even sure that that goes to the question that's presented here. That goes to whether there was some Miranda problem. It doesn't go to whether it was coerced. But then what happens is they just ask questions about the gun, nothing substantive about the crime. And the officer explains that he knows that there have been problems in the past in this area where school children have found guns, and that's what he's concerned about, this public safety exception. He asks just about that. The defendant tells him where he thinks the gun is. And then they go off and they say That's in the afternoon, right? Well, that was during this very first time. Yeah, first. So it's a very brief conversation. I believe they're in there for like eight minutes. Then they go off and they spend three hours trying to find the gun, but they can't find it. So they come back in at 3.30. They have another brief conversation with him. They say they can't locate the gun, and they ask him if he knows where it is. He says, I don't know. Then they leave again for another three hours. And in between this is important. They're checking on him. They give him a jacket when he's cold. They give him lunch. They give him grape juice, chips, a sandwich, and peach cobbler. They give him bathroom breaks. They give him water. He knocks on the door so he knows that if he needs anything at all, he can request it and they will see to his needs. So physically, he is perfectly comfortable. And there's – I don't think there's any question about that. So then at 6.30, they come in again. At that point, they've obtained a search warrant. They still haven't found the gun. And one thing that's important here is it was not actually an hour-and-20-minute interview at that point. And I would encourage the Court to actually read Sergeant Holloman's testimony. It's lengthy. He was on the stand for two days, but the entire testimony is in the excerpts of record. And there are some assumptions or paraphrasings that have been made in this case that I think slant his testimony in a way that is not accurate. And if you actually read it, I think you'll see exactly what happened. But it was not an hour-and-20-minute interrogation. And that's – that's something that is asked of him and he answers, no, it was not, because at some point, they step out of the room, because the defendant is saying, I want to talk to you, but I want to talk to my mother first. So they step out of the room, discuss whether they should let him talk to his mother, and they agree that he should be allowed to talk to his mother. They come back in and tell him that he'll be allowed to do that. Then they step out of the room again to set this up. They have to set up the phone line. They actually have to move him to a separate room where the phone is, because there's not a phone in his interrogation room. So – and that took some time. Then he had more water and he had a bathroom break before the phone call, and then he finally made the phone call at 759. So it's unclear exactly how long they were in the room with him, but it wasn't an hour-and-20 minutes. And it was at that point that the officer said, I don't need your statement. It's up to you whether you want to talk to me. We have enough evidence to know what happened that night, but if you want to talk to me, you can't. And there was simply nothing coercive about that statement. He never said that his goal was to get the defendant to make a statement. In fact, if you read his testimony, it's just the opposite. He's repeatedly saying, we don't need your testimony. And from his testimony, in fact, the officer truly doesn't believe that he needs that testimony. And then he's asked, would you prefer to have statements, a confession? And he says, well, of course. I mean, in every case, a confession can be helpful, but we sincerely didn't need it in this case. And that's what he's conveying to the defendant. Then he lets him talk to his mother. They do have the phone call. His mother says, do whatever you're going to do. And he says, at the very beginning of that phone call, I'm thinking of talking to them anyway. I was snotty to them at first, but they're cool. These are all his words. And I think I'm going to talk to them. So, again, up to that point, no coercion. So then he makes the statements. And the statements that were actually used at trial were extremely tangential. So even if the Court found the – got to that very high level of review and found that the State court's ruling was unreasonable, which I think would be very difficult to reach in this case, there was no prejudice under the Brecht standard in this case. The only – the only statements that were used were very – these tangential points about whether he threw away the bullets or his friend Frank White took them really was not at issue. And the defendant's own testimony on direct examination was completely sufficient to establish first-degree premeditated murder. Take these statements completely out of the equation, these impeaching statements from his confession, which, again, were minor. He says on direct examination that he felt humiliated and angry after he lost this fist fight with the victim a few days earlier. He called his friend Frank White, who came and picked him up. When they found the victim on the street, his friend handed him a gun and said, go pop him, which means to kill him. He got out of the car and started shooting and admits that he might have said something like – this is a quote – this is for that punk shit earlier. Right there, you have premeditated first-degree murder from his direct examination. Pardon me. So these – these minor points that were brought in from the cross-examination on the statements that he made made absolutely no difference in this case. And that's the bottom line. I have only one more small point, which is there's a suggestion that the prosecutor used one of these statements as substantive evidence. That is not the case. There was some question, did he – did Frank White ask you to hand the gun to Bay, another person in the car during the earlier robbery? The defendant said, I think so. The prosecutor said, would a statement refresh your memory? And then they played it or showed it to him, and he said yes. That was not the statement that he then discussed in the closing argument. In fact, that statement wouldn't have supported the closing argument. That was an instance where the defendant followed the directions of his friend Frank White. The – the testimony that the prosecutor was referring to was the next questioning, which was where Frank White had then said to the defendant, I want you to get out and commit this robbery with us, and he said no. And that was established on cross-examination without any reference to these – the statements that he had made to the police. And then the prosecutor then argued that that evidence refuted the claim that the defendant had no free will around this man, Frank White, and that he would simply do whatever he told him to do. So, in fact, no statements were used as substantive evidence in the closing argument whatsoever. And I assume that the instruction was given to confine the confession to impeachment? I don't recall. I'm not sure. Wasn't – was, though, however, the impeachment evidence was critical to that whole point of premeditation, was it not? No. No. That's what I was saying before. The defendant's own testimony on direct examination without any reference to the impeaching statements established that he was guilty of first-degree premeditated murder because he said, I was angry about losing this fight. I called my friend to pick me up, and we went around looking for the victim. When we found him, he gave me a gun and said to pop him. I got out, and I said, this is for that punk shit earlier, and then I shot him. And, in fact, he shot a couple of times. The first two times, the gun just clicked and didn't go off. The victim was fleeing, and then he fired four more times and shot him in the back. So clearly, there's premeditation and deliberation. The impeaching statements with the statements that had been given to the police were on these tangential and minor points, such as who threw away the bullets, whether this person, motorcycle Mike, was in the car at the time of the shooting, not that he had anything to do with the shooting. He was simply there. So if you completely take away these impeaching statements, it makes no difference on the evidence that the jury heard which showed first-degree murder. This is really kind of an unusual case in that he did testify. I'm sorry. In? I guess this is an unusual case in that he did testify. He did testify, yes. So it's not the usual run-of-the-mill where he didn't testify and only this was brought in, or they tried to get this in as a voluntary case. Correct. Thank you. If there are no further questions, thank you. Thank you. Do I have any time to respond? No. You've more than used your time. Thank you. The Court will now take approximately 15 minutes recess before hearing the last case.
judges: Schroeder, Canby, McKeown